UNITED STATES DISTRICT COURT
WESTER DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:08-CV-37

DAVID RYAN COLLIER                                                                                    PLAINTIFF

v.

INGRAM BARGE COMPANY                                                                       DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant's Motion for Summary Judgment (Docket #18). Plaintiff has responded (Docket #21). Defendant has replied (Docket #23). This matter is now ripe for adjudication. For the following reasons, Defendant's Motion for Summary Judgment is DENIED.

## BACKGROUND

Plaintiff David Collier alleges he was injured on or about January 18, 2007, when he tripped over a lock line (rope) on the deck of Defendant Ingram Barge Company's ("Ingram") fuel flat. Collier alleges he is a seaman who worked for Ingram as a crew member. Collier has sued Ingram for negligence under the Jones Act, 46 U.S.C. § 303104, unseaworthiness under general maritime law, and (in the alternative) under Section 905(b) of the Longshore and Harbor Workers Compensation Act, 33 U.S.C. § 901 *et seq*. ("LHWCA").

Collier began working as a tankerman trainee for Ingram on July 26, 2006. Collier worked from 5:00 a.m. until 5:00 p.m., ten days on and five days off. He slept at his home on shore every night. Collier reported to Calvin Hall, who worked in an office on shore. Collier was responsible for servicing Ingram's line boats by providing them with fuel, lubricants, and water, and removing trash and slop oil. Collier performed these services from fuel flats, which store gasoline, diesel fuel, lube oil, and potable water. These fuel flats are based out of Paducah,

Kentucky. The line boat ties off to the fuel flat for servicing. A tankerman (or tankerman trainee) hands the appropriate hoses to the line boat's engineer, who hooks the hose up and opens the valves. After these valves are shut off, the hose is passed back to the tankerman (or tankerman trainee). Deckhands from the line boat throw their trash into the fuel flat's dumpster. Collier also performed work on shore, including paperwork, moving oil drums from Ingram's facility to the fuel flat, transferring the trash collected to a larger dumpster on shore, and disposing of other items in specially marked dumpsters.

Collier ceased working for Ingram in August of 2007. He filed this personal injury lawsuit against Ingram on March 6, 2008. Ingram has now moved for summary judgment.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

Defendant moves for summary judgment on the basis that Plaintiff cannot recover under any asserted theory.  First, Plaintiff cannot recover because he is not a "seaman" under the Jones Act.  If he is not a seaman, Plaintiff also cannot recover for unseaworthiness under general maritime law.  Finally, Defendant asserts that Plaintiff has alleged only employer negligence under the LHWCA, for which there is no recovery.

**I.     Seaman Status Under the Jones Act**

The Jones Act provides that "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer."  46 U.S.C. § 30104.  The question of who is a "seaman" is a mixed question of law and fact. *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991).  When the facts and law are undisputed, "the issue is whether the facts meet the statutory standard." *Id.*  If reasonable persons, applying the proper legal standard, could differ as to whether Roberts was a "seaman," it is a question for the jury. *See id.*  But, "summary judgment . . . is mandated where the facts and the law will reasonably support only one conclusion." *Id.*

In *Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995), the Supreme Court held that the two essential requirements for seaman status are (1) that "an employee's duties must 'contribut[e] to

the function of the vessel or to the accomplishment of its mission,'" and (2) that the employee "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Id.* at 368 (citations omitted). The Court explained that "[t]he fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.* The Court should look to the totality of the circumstances. *Id.* at 370. "A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Id.* at 371.

Defendant's brief provides a nice summary of prior cases analyzing the issue of seaman status. In *Denson v. Ingram Barge Co.*, the Court held that a barge cleaner was not a seaman because "his duties did not expose him to the perils of the sea." 2009 WL 1033817, *3 (W.D. Ky. 2009). The hazards Denson faced – trip-and-fall, falling overboard, walking from barge to barge, etc. – were faced by longshoreman on a regular basis, and not peculiar to seamen. *Id.* Similarly, the plaintiff in *Lara v. Arctic King Ltd.* was not a seaman because his vessel was always tied to a pier, thus eliminating the risks faced by seamen. 178 F. Supp. 2d 1178, 1182 (W.D. Wash. 2001). As further proof, when the plaintiff was first injured, he was able to walk onto the shipyard pier and seek medical attention. *Id.*

In *Schultz v. Louisiana Dock Co.*, the Eastern District of Louisiana ruled that the plaintiff was not a seaman because his work was not of a seagoing nature. 94 F. Supp. 2d 746, 750 (E.D.

La. 2000). He did not go to sea, ate meals ashore, and went home every night. *Id.* In addition, the plaintiff "did not have a regular or continuous connection to an identifiable vessel or vessels." *Id.* Likewise, in *Fazio v. Lykes Bros. Steamship Co.*, the plaintiff was not a seaman because he was a shore-based worker. 567 F.2d 301, 302-03 (5th Cir. 1978). He lived at home, had never gone to sea, and on some days never worked on a vessel at all. *Id.*; *accord Poole v. Kirby Inland Marine, LP*, 2006 WL 2052877, *2 (S.D. Tex. 2006) (Shore-based tankerman who was paid hourly, was not a crew member, and never worked on a barge at sea was not a seaman). The Court found in *Fazio* that the plaintiff failed to have a sufficient permanent connection to a vessel because he worked on many different vessels in his employer's fleet, and his work was transitory in nature. 94 F. Supp. 2d at 303 ("[T]he larger the fleet, the more tenuous the relationship."); *accord Bouvier v. Krenz*, 702 F.2d 89, 91-92 (5th Cir. 1983) (shore-based ship repairman's relationship to vessels "not sufficiently continuous or substantial").

Defendant does not dispute the fact that Plaintiff meets the first requirement for seaman status. Thus, the issue is whether Plaintiff can satisfy the second requirement; does he have a substantial connection to the vessel in terms of duration and nature? Defendant argues that Plaintiff's duties are land-based, and he is not exposed to the perils of the sea. In contrast, Plaintiff asserts that the majority of his duties were not land-based, and his position as a tankerman trainee exposed him to maritime hazards on a regular basis. Neither party challenges the fact that Plaintiff spent more than 30 percent of his time in service of the vessel in navigation. Therefore, the Court must consider if the additional factual circumstances create a genuine issue of material fact as to whether Plaintiff is a seaman.

Defendant argues that the following facts indicate that Plaintiff is not a seaman. Plaintiff

worked twelve hour shifts from 5:00 a.m. to 5:00 p.m., and slept at his home on shore, i.e., he never slept aboard any of Defendant's vessels. Plaintiff reported to Calvin Hall, who worked in an office on shore. Plaintiff's services were provided from Defendant's fuel flats, which the Defendant describes as "floating service stations." These services are usually provided dockside, in which the line boat ties off to the fuel flat which is tied off to the shore. When these services are provided at the Defendant's fleet, the fuel flat is tied off to the line boat which is tied off to the fleet. Plaintiff never boarded the line boats. In addition, many of Plaintiff's job duties were based on the shore, such as doing paperwork, taking supplies and oil drums from the top of the hill and loading it onto the fuel flat, loading groceries, operating and monitoring the oil and water separator, loading gasoline into the fuel flat, and emptying trash. Defendant argues that these facts demonstrate Plaintiff did not have a substantial connection with the vessel. Defendant further argues that these facts demonstrate Plaintiff was not subject to the hazards and perils of the sea because Plaintiff spent the majority of his time on shore or on a vessel that was tied to a dock or in a fleet. Therefore, there was no risk that he would be trapped aboard a vessel, he was not required to await medical attention upon injury, and any other perils he faced were typical of the longshoremen who load and unload barges every day.

In contrast, Plaintiff asserts that he is a seaman, and offers the following factual support. He was told he was a crewmember of, and his loyalty was to, the vessels. He was paid daily like the crewmembers of Ingram's line boats and harbor tugs, while shoreside employees were paid hourly. Although he did not sleep on the fuel flat, he generally ate his meals on the line boats or the fuel flats. He often boarded the vessels to have pre-transfer conferences with the crew members. Plaintiff asserts that his shoreside duties were minor, and performed only on rare

occasions. Plaintiff claims he spent little time on the shore or dock; instead, he was riding or working on the fuel flats when they were moving (not tied off). Plaintiff estimates that 60-70% of his services were performed midstream. Plaintiff alleges that this midstream servicing exposed him to maritime hazards associated with snapping lines, being knocked over or falling overboard, the potential for drowning, dying from exposure, or being crushed between the fuel flat and line boat. In addition, there was a danger of the boat sinking or breaking away from the harbor tug, as well as inclement weather conditions, wind, waves, and wakes. Plaintiff received several manuals that dealt with seaman safety issues, and also received training in man overboard procedures and firefighting. When Plaintiff was injured, he had to wait to be transported to the shore for medical care.

The Court finds that a genuine issue of material fact exists as to whether Plaintiff qualifies as a seaman under the Jones Act. The parties disagree as to Plaintiff's shoreside duties, the amount of time Plaintiff spent on shore, the frequency and procedures for midstream servicing, the hazards Plaintiff faced, and the training he received. Viewed in a light most favorable to the non-moving party, the Court believes that a reasonable jury could find that Plaintiff qualifies as a seaman. Therefore, summary judgment should be denied.

## II.     Unseaworthiness under General Maritime Law

Plaintiff has also sued Defendant for unseaworthiness under the general maritime law of the United States. "Under the seaworthiness doctrine, there is an absolute duty to maintain a seaworthy ship, the breach of which imposes liability without fault, i.e., strict liability." *Perkins*, 246 F.3d at 602. "However, a vessel need not be 'free from all possibility of mishap, for the seaworthiness of a ship is a relative concept, dependent in each instance upon circumstances.'"

*Id.* "To prove an unseaworthiness claim, a plaintiff must show that the unseaworthy condition of the vessel was the substantial and direct or proximate cause of the plaintiff's injuries." *Id.* "Generally, unseaworthiness is a question of fact for the jury and should not be resolved by the district court as a matter of law." *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6th Cir. 2006).

Defendant argues that because Plaintiff was not a seaman, he cannot recover for unseaworthiness. The duty to provide a seaworthy ship is owed only to seamen. See *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 208 n.6 (1996); *Park v. Stockstill Boat Rentals, Inc.*, 492 F.3d 600, 604 (5th Cir. 2007). Because the Court finds that a genuine issue of material fact exists as to whether Plaintiff qualifies as a seaman, this claim also survives summary judgment.

### III.     Section 905(b) of the LHWCA

An injured longshoreman may maintain a negligence action against a vessel owner pursuant to Section 905(b) of the LHWCA. 33 U.S.C. § 905(b) ("In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party . . . ."). When the vessel owner also provides its own stevedoring services, as here, the Court treats the vessel owner as a "dual capacity" employer. A vessel owner is liable under Section 905(b) only for its negligence in its "owner" capacity. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 531 n. 6 (1983). In *Scindia Steam Navigaton Co. v. De Los Santos*, the Supreme Court established three duties a shipowner owes a longshoreman when it relinquishes control of the vessel to a stevedoring company. 451 U.S. 156, 167-78

(1981). The Sixth Circuit has held that these duties are "neither heightened nor diminished when the longshoreman is employed directly by the vessel." *Dietlin v. U.S. Steel Corp.*, No. 84-1589, 1985 WL 13799, at *2 (6th Cir. Oct. 18, 1985).

Defendant asserts that summary judgment is proper because Plaintiff has not alleged any negligence on the part of Defendant in its role as a vessel owner. Instead, Plaintiff's allegations are claims of employer negligence, and therefore not recoverable under Section 905(b). Defendant also argues that, even if Plaintiff has asserted a proper claim under Section 905(b) for owner negligence, he has not created a genuine issue of material fact that Defendant breached one of the three duties imposed by *Scindia*: (1) a turnover duty; (2) an active control duty; and (3) a duty to intervene. 451 U.S. at 165. Defendant argues that even if a turnover duty existed, Plaintiff admitted in his deposition that the injury occurred during the daytime, and he could have seen the lock line if he had looked down.

Plaintiff, on the other hand, argues that Defendant breached its "turnover duty." This duty states that a vessel owner must exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." *Scindia*, 451 U.S. at 167. As part of this duty, the vessel owner must also "warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care." *Id.* Plaintiff's complaint asserts that Defendant "failed to keep the work area where Plaintiff was working free from debris and other trip hazards," and Plaintiff now argues that this allegation of negligence is

sufficient to withstand summary judgment.[1]

Plaintiff points to *Martinez v. Korea Shipping Corp., Ltd.*, 903 F.2d 606, 609 (9th Cir. 1990), in support of his argument that a vessel can be liable for failing to keep the work area free from debris or other hazards. In *Martinez*, the Ninth Circuit found that a vessel owner could be found negligent for an unguarded ladder opening that was "neither covered nor surrounded by a guard rail." *Id.* at 607. Plaintiff's case differs from *Martinez* in that an unguarded ladder opening is part of the vessel, while a lock line (or rope) may be freely moved about or removed from the vessel. However, courts have held that non-obvious tripping hazards may be included in the turnover duty. *See, e.g.*, *Subingsubing v. Reardon Smith Line, Ltd.*, 682 F.2d 779, 782 (9th Cir. 1982) ("That duty should at least include reasonable care to keep the deck clear of dangerous and non-obvious tripping hazards at the time that the longshoreworker comes on board."). In addition, the lock line is likely considered equipment of the vessel, not merely debris. Plaintiff's affidavit states that the lock line was "coiled up to approximately the level of my knees." The turnover duty specifically refers to "the ship *and its equipment*." *Scindia*, 451 U.S. at 167 (emphasis added). The Court finds that Plaintiff's allegation of negligence due to "debris and other trip hazards" is sufficient under Section 905(b).

---

[1] Plaintiff's Complaint also contains three additional allegations of negligence: "a) the Defendant failed to provide Plaintiff with a safe place in which to work; and b) the Defendant failed to provide Plaintiff with adequate training to perform his job duties; and . . . d) the Defendant failed to provide an adequate crew to perform the work required." Plaintiff failed to address these allegations in his response brief, although they were raised by Defendant's Motion. The Court agrees with Defendant that these allegations are claims of employer negligence, not vessel negligence. *See, e.g.*, 33 U.S.C. § 941 ("Every employer shall . . . render safe such employment and places of employment, and [ ] prevent injury to his employees."); *Becker v. Tidewater, Inc.*, 586 F.3d 358, 374 (5th Cir. 2009) (failure to train employees was employer negligence); *Denson*, 2009 WL 2447930, at *2.

In order to survive summary judgment, Plaintiff must still present a genuine issue of material fact that the turnover duty was breached by Defendant. The turnover duty essentially consists of two aspects: a duty to turn the vessel over in a safe condition, and a duty to warn longshoremen of "any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care . . . ." *Scindia*, 451 U.S. at 167. The duty to warn applies only to those hazards which are not known by the longshoreman, and are not obvious or anticipated by a reasonably competent longshoreman. *Id.* (quoting *Scindia*, 451 U.S. at 167). As to the safe condition duty, "the plaintiff must introduce evidence that the hazard was such that an expert and experienced stevedore would not 'be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property.'" *Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1208 (9th Cir. 1989) (quoting *Scindia*, 451 U.S. at 167).

Defendant argues that Plaintiff admitted it was daytime when he tripped, and he could have seen the lock line had he looked down, and therefore an expert and experienced longshoreman could have safely performed his work. Further, the danger was an obvious one. For these reasons, Defendant asserts it did not breach its turnover duty. Plaintiff contends that although he acknowledged it was daytime, his view was obstructed by a lube oil tank, and he could not have seen the lock line until he tripped over it. Plaintiff argues that a genuine issue exists as to whether the lock line was in plain view or obvious.

"Summary judgment is rarely granted in negligence cases." *Martinez*, 903 F.2d at 609. Whether Defendant's duty was breached is a question of fact. *Id.* Viewing the evidence in a light most favorable to the Plaintiff, the Court finds that a genuine issue of material fact exists as

to whether the lock line hazard was obvious or anticipated by a reasonably competent longshoreman, or if the lock line was an unreasonable hazard for expert and experienced longshoremen exercising reasonable care.  For this reason, summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is DENIED.